IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| THERESIA COLLINS, | ) | Case No. 1:20-cv-1587 |
| | ) | |
| Plaintiff, | ) | JUDGE JOHN R. ADAMS |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | THOMAS M. PARKER |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

Plaintiff, Theresia Collins, seeks judicial review of the final decision of the

Commissioner of Social Security, denying her application for disability insurance benefits

("DIB") under Title II of the Social Security Act.  Collins claims that the Administrative Law

Judge ("ALJ") misevaluated the opinion evidence, including the opinions of her treating

physician – Nana Kobaivanova, M.D. – a consultative examiner, and the state agency consulting

physicians.  She also claims that the ALJ improperly discounted her subjective symptom

complaints and misevaluated the evidence regarding her carpal tunnel syndrome, peripheral

neuropathy, and back pain based on her decision to undergo conservative treatment and alleged

noncompliance with treatment.

This is not the court's first encounter with the denial of Collins's application.  Judge

Christopher Boyko previously vacated and remanded an earlier ALJ decision upon my

recommendation.  I had determined the ALJ: (1) failed to give sufficiently specific "good

reasons" for discounting all three of Dr. Kobaivanova's opinions because the first one cited a

physical therapist functional evaluation when the latter two didn't; (2) failed to point to specific evidence to support her finding that Dr. Kobaivanova's opinions were inconsistent with the record; and (3) some of the ALJ's reasons for discounting her subjective symptom complaints did not undermine them and seemed to be mischaracterizations of the record.  A review of the ALJ's decision on remand, however, reveals that those concerns are no longer present and that the ALJ applied proper legal standards and reached a decision supported by substantial evidence.

I recommend that the Commissioner's final decision denying Collins's application for DIB be affirmed.

## I.    Procedural History

On April 25, 2014, Collins applied for DIB.  (Tr. 154).[1]  Collins alleged that she became disabled on December 3, 2013, due to "1. diabetes; 2. high blood pressure; 3. carpal tunnel; [and] arthritis in hands."  (Tr. 154, 182).  The Social Security Administration ("SSA") denied Collins's application initially and upon reconsideration.  (Tr. 90-96, 98-108).  Collins requested an administrative hearing.  (Tr. 118).  ALJ Catherine Ma heard Collins's case on March 9, 2016 and denied the claim in an August 25, 2016 decision.  (Tr. 11-28, 33-87).  On February 14, 2017, the Appeals Council denied further review.  (Tr. 1-3).  On July 11, 2018, at my recommendation, Judge Boyko remanded Collins's case to the Commissioner for further proceedings.  (Tr. 937-47, 979).

Meanwhile, on March 24, 2017, Collins filed a second application for DIB.  (Tr. 1174-80).  Collins alleged that she became disabled on August 21, 2016, due to "1. Diabetes Mellitus; 2. Carpal Tunnel Syndrome; 3. Peripheral Neuropathy; 4. Arthritis; 5. Back Pain; [and] 6. Vertigo."  (Tr. 1174, 1228).  The SSA denied Collins's second DIB claim initially and upon

---

[1] The administrative transcript appears in ECF Doc. 11.

reconsideration.  (Tr. 912-21, 923-35).  On October 16, 2017, she requested an administrative hearing.  (Tr. 1001-02).

On October 22, 2018, the Appeals Council vacated the ALJ's 2016 decision denying Collins's DIB claim, remanded the case to the ALJ for further consideration, and consolidated Collins's 2014 and 2017 DIB proceedings.  (Tr. 948-51).  The ALJ held a hearing on the consolidated application on May 22, 2019 and denied the claim in a July 31, 2019 decision.  (Tr. 793-800, 866-911).  On May 15, 2020, the Appeals Council denied further review, rendering the ALJ's decision the final decision of the Commissioner.  (Tr. 783-86).  On July 19, 2020, Collins filed a complaint to obtain judicial review.  ECF Doc. 1.

## II.     Evidence

### A.      Personal, Educational, and Vocational Evidence

Collins was born on July 7, 1955, and she was 58 years old on the alleged onset date. (Tr. 90, 154, 1174).  Her date last insured was December 31, 2018, at which time she was 63 years old.  (Tr. 796).  Collins completed high school in 1974.  (Tr. 1229).  She had past relevant work as an assembly solderer and production assembler.  (Tr. 905-06, 1229).

### B.      Relevant Medical Evidence

Collins's treatment notes indicated that she suffered from diabetes since 2000 and hypertension since 2008.  (Tr. 265, 269).  On May 11, 2010, Collins underwent an electromyography ("EMG") of the upper extremities, which revealed: (1) moderately severe, subacute to chronic, right median mononeuropathy at the wrist – carpal tunnel syndrome; (2) mild to moderate, subacute to chronic, left median mononeuropathy at the wrist – carpal tunnel syndrome; (3) mild, subacute to chronic, left, cervical radiculopathy affecting the C7 and

C8 nerve roots; and (4) markedly severe, chronic, right, ulnar mononeuropathy at the wrist, which did not appear to be symptomatic.  (Tr. 715-17).

On January 8, 2013, Collins visited the Cleveland Clinic for a follow-up visit and pain and was seen by Chompunut Asava Aree, MD.  (Tr. 264-65).  Collins presented with pain associated with her neuropathy and reported hypoglycemic symptoms once her blood glucose levels fell below 120 mg/dl.  (Tr. 264).  At the time, she was prescribed Janumet for her diabetes but had only been taking it once per day, when her prescription called for it to be taken twice per day.  (Tr. 264, 267).  Dr. Aree determined that Collins had diabetes type 2 "poorly controlled" and referred her to a podiatrist and an ophthalmologist for diabetes checks.  (Tr. 264, 267).  Collins was also diagnosed with hypertension, which Dr. Aree noted was in "poor control." (Tr. 267).

On February 27, 2013, Collins visited Debra Thornton, DPM, for a diabetes foot check. (Tr. 277).  Collins stated that she did not check her blood sugar in the morning, had not checked it since the weekend, and had never been to a podiatrist.  (*Id.*).  She claimed shooting pains in both her feet, causing extreme pain regardless of what activity she engaged in; numbness on her left foot for 10-12 months; itching on her right ankle; extreme pain on the inside of her big toes; and occasional toe cramps.  (*Id.*).  Dr. Thornton took radiographs of Collins's feet, which showed hallux valgus and bunion bilaterally ("HAV"); left first metatarsophalangeal ("MTP") arthritis with dorsal osteophyte; and right plantar heel spur.  (Tr. 279).  Dr. Thornton's impression was that Collins had HAV due to her neuropathy, osteoarthritis, and a calcaneal spur.  (*Id.*).  Collins indicated that she would like surgical intervention and was instructed to schedule surgery.  (*Id.*).

On May 22, 2013, Collins returned to the Cleveland Clinic and was seen by Andriy Viter, MD, and Maria Miklowski, MD.  (Tr. 292).  Collins presented with new onset bilateral leg pain

and swelling lasting two weeks, blurred vision, and elevated blood glucose.  (*Id.*).  She stated
that she only had two weeks left of insulin due to costs.  (*Id.*).  Dr. Viter diagnosed Collins with
type 2 diabetes/unspecified without mention of complication, blurred vision, hypertension, and
lower extremity edema.  (Tr. 294).  He ordered her to follow up in two weeks for her diabetes
and consult an ophthalmologist, noting that her hypertension was under "good control."  (*Id.*).

That same day, Collins presented to Dr. Thornton with occasional shooting pains in both
feet causing pain rated at 10/10 and occasional cramping in her toes.  (Tr. 299).  Upon
examination, Collins had full muscle strength and decreased range of motion in her ankle joint
and first MTP joint without pain or crepitus.  (*Id.*).  Dr. Thornton diagnosed Collins with
neuropathy, onychomycosis, equinus, and hallux limitus.  (*Id.*).

On May 30, 2013, Collins visited ophthalmologist Yael Dinar Kushnir, MD, for a
diabetic eye exam.  (Tr. 302).  Collins reported blurred vision and difficulty seeing up close and
reading small print.  (Tr. 302, 306).  After examination, Dr. Kushnir repeated Collins's diabetes
diagnosis, noting that she had no diabetic retinopathy, and diagnosed her with senile nuclear
sclerosis and presbyopia – for which she was prescribed reading glasses.  (Tr. 304).

On June 12, 2013, Collins returned to the Cleveland Clinic for a follow up on her
diabetes and was seen by Diana Lorenzo, MD.  (Tr. 307).  Collins reported 10/10, shooting and
burning pain in her lower extremities.  (Tr. 307-08).  She also requested vaccinations, indicating
that she planned to start working from her house taking care of children.  (Tr. 308).  A sonogram
of her lower extremities revealed no evidence of deep vein thrombosis.  (Tr. 309).  Dr. Lorenzo
increased Collins's insulin and prescribed Elavil to treat her neuropathic pain.  (Tr. 309).
Dr. Lorenzo also diagnosed Collins with hypokalemia and hypertension, which she noted was
"well control[led]."  (Tr. 309-10).

On December 10, 2013, Collins visited the Cleveland Clinic for another follow up on her diabetes and was seen by Dharmesh Gopalakrishnan, MD.  (Tr. 328).  Collins indicated that she had stopped taking two of her medications because she ran out but got back on them in November 2013.  (*Id.*).  She checked her blood glucose levels twice daily and had no hypoglycemic episodes.  (*Id.*).  She also reported severe pain throughout the day for the past four months, for which she took ibuprofen "round the clock."  (Tr. 329, 333).  Collins stated that a wrist splint did not alleviate the pain.  (Tr. 329).  She indicated that she was apprehensive about surgery and never had a local steroid injection.  (*Id.*).  She also stopped taking Elavil because it did not provide significant relief.  (*Id.*).  Dr. Gopalakrishnan noted that Collins's hypertension was "[f]airly well controlled; Compliant to medications."  (Tr. 328).  He increased her insulin and blood glucose monitoring, continued her hypertension medication, and instructed her to consult a plastic surgeon for her carpal tunnel.  (Tr. 330-31).

On December 18, 2013, Collins returned to Dr. Thornton for a diabetic checkup, reporting numbness in her toes but manageable pain.  (Tr. 336).  Her examination results were the same as her May 2013 appointment.  (*Id.*).

On December 19, 2013, Collins visited Yuji Umeda, MD, PhD, for an orthopedic consultation.  (Tr. 248).  Collins's chief complaint was hand pain.  (*Id.*).  She stated that her symptoms began over three years prior.  (*Id.*).  She had been using wrist splints, but the pain had worsened over the previous four months.  (*Id.*).  Collins suffered from stabbing, penetrating pain several times a day rated at a 10/10, which was exacerbated by daily activities.  (*Id.*).  Collins specified that her pain caused severe difficulty opening jars; moderately limited her work; and made sleep moderately difficult.  (Tr. 253).

Upon examination, Dr. Umeda noted "Normal exam" of Collins's lower extremities. (Tr. 250). Examination of the upper extremities revealed "5 out of 5" grip strength and normal range of motion with hands and wrists. (Tr. 251-52). Collins's right hand had minimal adduction deformity; mildly prominent carpometacarpal joint with tenderness and crepitation; decreased light touch sensation; severe flexion compression test; and moderate Tinel sign over the carpal tunnel. (Tr. 251). Her left hand had no adduction deformity; no prominent carpometacarpal joint, but tenderness and crepitation were present; moderate flexion compression; moderate Tinel sign; slightly decreased light touch sensation; and weak thumb abduction. (Tr. 251-52). X-rays showed mild carpometacarpal arthritis bilaterally. (Tr. 252, 256, 260).

Dr. Umeda diagnosed Collins with bilateral carpal tunnel syndrome and bilateral carpometacarpal arthritis. (Tr. 252). Dr. Umeda explained Collins's treatment options, stating the non-operative options included steroid injunction and physical/occupational therapy but suggested surgical treatment. (*Id.*). Dr. Umeda referred Collins for an EMG, and Collins agreed to see an orthopedic surgeon. (*Id.*).

On January 14, 2014, Collins returned to the Cleveland Clinic to follow up on her diabetes and was seen by Pichapong Tunsupon, MD. (Tr. 351). Dr. Tunsupon noted improved blood sugar control, Collins's hypertension was well controlled, and Collins was compliant to her hypertension medication. (*Id.*). Collins reported severe pain throughout the day and wore a wrist splint but was "not ready for surgical decompression" at the time. (*Id.*). Dr. Tunsupon increased Collins's insulin and recommended that she continue to wear the wrist splint. (Tr. 353).

On March 4, 2014, Collins presented to Dr. Gopalakrishnan for a follow up on her diabetes. (Tr. 358). Her insulin was "much better controlled," but she ran out of one of her

7

medications the previous week due to insurance coverage issues and had been laid off from work. (*Id.*). Her hypertension was under "fair control." (*Id.*). Collins's examination was normal except for bilateral wrist pain. (Tr. 359-60). Dr. Gopalakrishnan continued Collins's medication for hypertension and diabetes, adjusting her diagnosis to "Diabetes mellitus improved control." (Tr. 360). He also diagnosed her with dyslipidemia and carpal tunnel syndrome. (*Id.*). He discussed with Collins steroid injections and surgery, but Collins was not "enthusiastic about either," deferring the matter. (*Id.*).

On March 31, 2014, Collins visited Dr. Thornton, reporting right foot pain and swelling beginning two months earlier. (Tr. 364). Radiographs showed bilateral hallux valgus and mild first metatarsophalangeal joint degenerative change on the left. (Tr. 364, 368). Dr. Thornton diagnosed Collins with diabetes mellitus with neuropathy, onychomycosis, equinus, hallux limitus, and hallux abducto valgus deformity, and prescribed topical medication. (Tr. 364).

On June 9, 2014, Collins presented to Dr. Thornton with right foot pain and swelling, stating that the topical medication had not been helping. (Tr. 529). Dr. Thornton diagnosed Collins with tenosynovitis of the foot and ankle and pain in limb and referred Collins to physical therapy. (Tr. 529-30).

On June 24, 2014, Collins returned to the Cleveland Clinic for her diabetes, blood pressure, and back pain and was seen by Nana Kobaivanova, MD. (Tr. 535). Collins reported her pain as 9/10, continuous, and throbbing. (Tr. 541). Dr. Kobaivanova diagnosed Collins with type 2 diabetes not at goal and uncontrolled, hypertension not otherwise specified, and back pain. (Tr. 536-37). Dr. Kobaivanova increased Collins's insulin; continued her hypertension medication – noting it was under "good control," and prescribed Tylenol and physical therapy of her back pain. (*Id.*).

8

On August 7, 2014, Collins visited NovaCare Rehabilitation for physical therapy, reporting "8-9/10" lower back pain and difficulty performing activities requiring standing for more than ten minutes.  (Tr. 414).  The pain began suddenly five months earlier while she was washing dishes.  (*Id.*).  Upon examination, she had 4/5 muscle strength in hip abduction, adduction, extension, and flexion, as well as knee extension.  (*Id.*).  She had 5/5 knee flexion, ankle dorsiflexion, and ankle plantarflexion.  (*Id.*).

On October 13, 2014, Collins returned to the Cleveland Clinic and was seen by Sunny Lee, DO.  (Tr. 546).  Collins reported bilateral shoulder pain, with acute pain in her right shoulder, causing difficulty to lift her shoulders.  (*Id.*).  Upon examination, Dr. Lee noted limited active motion at right arm due to pain and full range of motion on the left shoulder.  (Tr. 547).  Dr. Lee diagnosed Collins with bilateral shoulder pain likely due to osteoarthritis and improved but uncontrolled diabetes.  (*Id.*).

On December 23, 2014, Collins was seen by Priyanka Pophali, MD, for a follow up at the Cleveland Clinic, reporting 10/10 shoulder pain.  (Tr. 553, 560-61).  Dr. Pophali referred Collins to physical therapy for her shoulder, increased her insulin, and continued her hypertension medication.  (Tr. 555).

On December 30, 2014, Collins visited the Cleveland Clinic for worsening back, shoulder, and neck pain (8/10) and was seen by Yazeed Sawalha, MD.  (Tr. 564, 571-72).  Collins described the pain as sharp, radiating to the left occasionally, and severe enough that she could not move her shoulder or walk.  (Tr. 564).  Upon examination, Dr. Sawalha noted decreased range of movement of the right shoulder, no edema, and positive straight leg raise on the left side.  (Tr. 566).  Dr. Sawalha referred Collins to physical therapy, injected her right shoulder with a steroid, and prescribed pain medication.  (Tr. 566-67).

9

On January 19, 2015, Collins failed to appear to her scheduled physical therapy appointment.  (Tr. 573).  On March 3, 2015, Collins visited the Cleveland Clinic for a follow up and was seen by Shaza Azmat, MD.  (Tr. 580).  Collins complained of worsening weakness in both hands, stating that she had been dropping things.  (*Id.*).  She had associated symptoms of pain in both palms, numbness, and tingling, but declined surgery for her carpal tunnel.  (*Id.*).  Collins also reported worsening right shoulder pain and stiffness, with an inability to lift above her head or extend her shoulder.  (*Id.*).  The steroid injection only provided slight relief that lasted a couple of weeks.  (*Id.*).  Last, Collins stated she had chronic low back pain and numbness in her bilateral big toes.  (*Id.*).  Dr. Azmat increased Collins's diabetes medication, ordered an MRI of her shoulder, and prescribed vitamins for her neuropathy.  (Tr. 582).  The MRI revealed rotator cuff tendinosis and small partial tear of the supraspinatus tendon.  (Tr. 589).

On April 13, 2015, Collins presented to Dr. Kobaivanova with cervical pain and a "clicking noise," reporting 8/10 pain.  (Tr. 593, 600).  Collins stated that she was not taking her mealtime insulin before each meal, taking it only once per day because she didn't want to use insulin four times per day.  (Tr. 593).  Dr. Kobaivanova diagnosed Collins with type 2 diabetes mellitus with neurological complications, uncontrolled, worsening control; degenerative joint disease with symptoms of cervical radiculopathy; hypertension not otherwise specified; vitamin B12 deficiency; and right rotator cuff tear.  (Tr. 595).  Dr. Kobaivanova replaced Collins's mealtime insulin medication.  (*Id.*).

On July 21, 2015, Collins returned to the Cleveland Clinic for a follow up and was seen by Alejandra Gutierrez, MD.  (Tr. 624).  Collins indicated that her blood glucose levels were between 60-90 in the morning; she started shaking at night when her blood glucose levels were

between 100-120; and she had shoulder pain (10/10) when reaching back and lifting her harm that was not alleviated by Motrin. (Tr. 624, 634). Dr. Gutierrez noted that Collins was getting hypoglycemic in the morning and ordered a lipid panel and a diabetic foot care consult. (Tr. 627). Dr. Gutierrez stated that Collins's hypertension was well controlled, noted that Collins did not have insurance or a job with which to pay for a physical therapist to address her shoulder, and ordered vitamin B12 injections. (*Id.*).

On August 13, 2015, Collins went to the Cleveland Clinic's Emergency Department with intermittent left flank pain, lower abdominal pain, and bilateral shoulder pain starting a month before. (Tr. 460-61, 463). Collins was diagnosed with urinary tract infection and left lumbar radiculopathy and discharged with instructions to follow up with her primary care physician. (Tr. 465-66, 471).

On August 20, 2015, Collins visited the Cleveland Clinic and was seen by Abrahim Syed, MD. (Tr. 645). She reported abdominal, back, and neck pain. (*Id.*). She was most concerned about the pain in her left flank, which felt similar to how she felt before she had her kidney removed in 1985. (*Id.*). Upon examination, Dr. Syed noted decreased lateral range of motion of the neck, tenderness in her back and neck, negative straight leg raise, and severely decreased right shoulder range of motion. (Tr. 647). Dr. Syed diagnosed Collins with left sided low back pain without sciatica, neck pain, tendinopathy of right rotator cuff, flank pain, and Vitamin B12 deficiency. (Tr. 647-48). He prescribed ibuprofen and Robaxin for her low back and neck pain and suggested physical therapy for her shoulder after orthopedic evaluation. (*Id.*).

On September 2, 2015, Collins visited the Cleveland Clinic was seen by Alan Duignan, PA-C. (Tr. 657). She reported right shoulder pain and stiffness. (*Id.*). Upon examination, Collins had mild global loss of range of motion and pain upon rotator cuff testing. (Tr. 658).

Duignan diagnosed her with right shoulder adhesive capsulitis and rotator cuff partial tearing and impingement.  (*Id.*).  He prescribed pain medication.  (*Id.*).

On November 17, 2015, Collins presented to Dr. Kobaivanova, reporting intermittent pain (7/10) on her left side, under the rib cage.  (Tr. 678, 685).  The pain was chronic with a little more intensity.  (Tr. 675).  Collins reported that her blood sugar levels were "much better since she is more compliant with" her medications and insulin.  (*Id.*).  Her shoulder pain had also improved but she still suffered from arthritic pain.  (*Id.*).  Dr. Kobaivanova continued Collins's diabetes and hypertension medication and ordered a vitamin B12 injection.  (Tr. 680).

On February 29, 2016, Collins returned to Dr. Kobaivanova, stating she had a lot of pain in her joints, as well as stiffness and pain and crepitus with turning of the neck, that was only temporarily alleviated by Motrin.  (Tr. 694).  Collins also reported dizziness and had lost weight, despite compliance with medication.  (*Id.*).  Her blood sugar was between 80-130.  (*Id.*).  Dr. Kobaivanova continued Collins's diabetes and hypertension medication and prescribed: vitamin D2 to address a vitamin D deficiency; meloxicam for her osteoarthritis; and a vitamin B12 injection.  (Tr. 696).

On March 30, 2016, Collins visited Dr. Thornton, reporting numbness and pain in her feet and right bunion pain.  (Tr. 703).  Collins requested surgery.  (*Id.*).  X-rays showed moderate hallux valgus with bunion; no fracture or dislocation; preserved joint spaces; no erosions; and small plantar and posterior calcaneal enthesophytes.  (*Id.*).  Dr. Thornton diagnosed her with plantar fasciitis, diabetes with neuropathy, onychomycosis, "PVD", equinus, pain, calcaneal spur, pes cavus, and tenosynovitis stable.  (Tr. 703-04).  Dr. Thornton scheduled a bunionectomy of the right hallux and excision of a nodule on the right foot.  (Tr. 704).

On June 14, 2016, Collins returned to Dr. Kobaivanova, stating that she had stopped taking insulin because she could not afford it.  (Tr. 728).  She had started taking Mobic for her shoulder and back pain and carpal tunnel, which was "helping much."  (*Id.*).  She was otherwise compliant with her medication.  (*Id.*).  Dr. Kobaivanova diagnosed Collins with type 2 diabetes mellitus with diabetic neuropathy and neurological complications, uncontrolled.  (Tr. 730).  Dr. Kobaivanova increased her diabetes medication, continued her hypertension medication, and provided a vitamin B12 injection.  (Tr. 730-31).

On July 19, 2016, Collins visited the Cleveland Clinic for dizziness over the previous nine months that had been worsening and was seen by Ram Amuthan, MD.  (Tr. 740).  She got dizzy with exertion, especially when walking.  (*Id.*).  She also reported mild headache sometimes associated with dizziness, itching in her right leg, and ankle swelling that worsened toward the end of the day.  (*Id.*).  Dr. Amuthan ordered testing for her dizziness and continued her diabetes medication.  (Tr. 745).

On September 20, 2016, Collins presented to Dr. Kobaivanova, indicating that she was feeling "Ok."  (Tr. 760).  She was compliant with her medication, other than insulin.  (*Id.*).  Upon examination, Collins stated that her back and shoulder pain had improved with Mobic and she had short dizziness episodes that were helped by Meclizine.  (Tr. 761).  Dr. Kobaivanova continued Collins's diabetes medication, ordered a vitamin B12 injection, and suggested vestibular rehabilitation for her dizziness.  (Tr. 762-63).

On October 10, 2016, Collins visited the Cleveland Clinic and was seen by Louis Samuel Williams, MD.  (Tr. 773).  Collins reported persistent recalcitrant pain in the lower back and neck associated with radiation down the right thigh.  (Tr. 774).  The pain was present throughout the day and worsened with activity and lying flat.  (*Id.*).  Upon examination, Collins was tender

to palpation at L4-L5, she had mildly diminished quadricep strength, and she had a negative straight-leg raise test.  (Tr. 777).  Dr. Williams stated that Collins's diabetes was improving with current medication and her hypertension was intermittently well controlled.  (Tr. 773).  He continued medication and prescribed Neurontin.  (Tr. 773-74).

On April 5, 2017, Collins presented to Dr. Williams with left shoulder pain.  (Tr. 1420-21).  She described the pain as aching in nature, exacerbated by flexion and abduction at the shoulder joint.  (Tr. 1421).  Her shoulder was limited by pain but otherwise had full passive range of motion and muscle strength.  (*Id.*).  Dr. Williams continued Collins's diabetes medication – noting improved control – and ordered physical therapy for her chronic pain.  (Tr. 1420-21).

On September 21, 2017, Collins visited the Cleveland Clinic for a same-day visit and was seen by Marc Monachese, MD.  (Tr. 1472).  Collins reported "6-9/10" pain all over her body, affecting her extremities and torso.  (*Id.*).  The pain was described as a "stab" or "shock."  (*Id.*).  Dr. Monachese noted that Collins's blood sugar had worsened, which might be aggravating her neuropathy pain.  (*Id.*).  Dr. Monachese increased Collins's Neurontin medication to address her pain.  (Tr. 1476).

On November 28, 2017, Collins visited the Cleveland Clinic for a same-day appointment and was seen by Sukhwinder Sing, MD.  (Tr. 1452).  She reported worsening left shoulder pain that was no longer relieved by Mobic, carpal tunnel that caused her to drop things while working at home, and two hypoglycemic events per week when she did not eat.  (Tr. 1452-53).  Upon review of symptoms, Collins reported shoulder joint pain, wrist weakness, and paresthesia.  (Tr. 1453).  On examination, Collins had limited overhead abduction with the left shoulder, positive Tinel sign, and impaired two-point discrimination on hands.  (Tr. 1455).  Her right shoulder

14

exam was normal, and she had 4/5 grip strength.  (*Id.*).  Dr. Sing diagnosed her with: (1) left-sided frozen shoulder; (2) bilateral carpal tunnel syndrome that was not improving; (3) type 2 diabetes mellitus; and (4) hypertension.  (Tr. 1456-57).  Dr. Sing noted that insurance did not cover physical therapy and printed illustrative exercises for Collins to perform for her shoulder, suggested orthopedic surgery or steroid injections for her carpal tunnel, and continued diabetes and hypertension medication.  (*Id.*).

On December 1, 2017, Collins presented to Dr. Thornton with pain and numbness in her feet.  (Tr. 1486).  Collins described the pain as sharp and rated it at 10/10.  (*Id.*).  She had stopped checking her blood sugar levels because she ran out of testing strips and took Tylenol for pain.  (*Id.*).  She also complained of constant itching on her legs that was not alleviated by anti-itch cream.  (*Id.*).  Dr. Thornton repeated her previous diagnoses and instructed Collins to return after consulting Dr. Kobaivanova about her diabetes.  (Tr. 1486-87).

On December 8, 2017, Collins underwent an EMG of her upper extremities.  (Tr. 1506).  The results showed bilateral median neuropathies at or distal to her wrists, consistent with moderate carpal tunnel syndrome.  (Tr. 1507).  It also showed mild patchy motor axon loss changes consistent with a right C8 motor radiculopathy.  (*Id.*).

On January 7, 2019 – the next available treatment records – Collins visited the Cleveland Clinic and was seen by Jaline Wilkes, APRN, CNP.  (Tr. 1508).  Collins reported new upper back pain and continued chronic sciatic pain.  (*Id.*).  She denied leg swelling, dizziness, numbness, or tingling.  (*Id.*).  She had been referred to physical therapy but her insurance would not cover it.  (*Id.*).  Upon examination, Collins had tenderness and pain in her thoracic back and normal range of motion.  (Tr. 1509).  She was ordered to get X-rays.  (*Id.*).  The X-rays showed

grade 1 anterolisthesis of L4 on L5, mild disc space narrowing at L4-5 and L5-S1, mild lower lumbar facet hypertrophy, and mild bilateral SI joint degenerative changes. (Tr. 1555).

On January 22, 2019, Collins presented to Dr. Kobaivanova with back pain that radiated to her buttocks and left lingual pain. (Tr. 1518). She had not been checking her blood sugar at home. (*Id.*). Upon examination, Collins's neck was supple, her lumbar area was tender on palpation, and she had normal range of motion. (Tr. 1520). Dr. Kobaivanova diagnosed Collins with osteoarthritis of spine with radiculopathy, generalized osteoarthritis, hypertension, left hip pain, type 2 diabetes mellitus with diabetic polyneuropathy, chronic kidney disease, neuropathy, and vitamin D deficiency. (Tr. 1520-21). Dr. Kobaivanova continued Collins's medication and instructed her to consult pain management anesthesia and physical therapy. (Tr. 1520). She also increased her diabetes medication. (*Id.*).

On March 8, 2019, Collins presented to Dr. Thornton with sharp pain (10/10) and numbness in both feet. (Tr. 1537). She also reported constant itching in the left shin. (*Id.*). Dr. Thornton diagnosed her with diabetes neuropathy, pain, and pes cavus and increased her nerve pain medication. (Tr. 1537-38).

On April 23, 2019, Collins returned to Dr. Kobaivanova, reporting pain in multiple joints related to carpal tunnel, chronic back pain, and bilateral neuropathic pain. (Tr. 1542). She also reported low blood sugar in the morning and times that she did not take her morning insulin due to low blood sugar levels. (*Id.*). She said she was unwilling to have surgical intervention for her carpal tunnel. (*Id.*). Dr. Kobaivanova continued Collins's hypertension medication, prescribed Meloxicam for her arthritis, and ordered a physical performance test. (Tr. 1544-45).

### C.       Relevant Opinion Evidence

#### 1.       Treating Physician Opinions – Nana Kobaivanova, MD

##### a.       November 6, 2014

On November 6, 2014, Dr. Kobaivanova prepared a form "Physical Residual Functional Capacity," consisting of prompts of Collins's maximum ability and a selection of limitations for Dr. Kobaivanova to circle.  (Tr. 433-34).  Dr. Kobaivanova circled limitations indicating that Collins could: (1) occasionally and frequently lift/carry less than 10 lbs.; (2) sit/stand/walk for less than 2 hours in an 8-hour work day; (3) sit for 30 minutes before changing position if alternating periodically between sitting, standing, or walking; (4) stand for 20 minutes before changing position; and (4) needed the opportunity to shift positions at will from sitting or standing/walking.  (Tr. 433).  In support of these findings, Dr. Kobaivanova cited Collins's low back pain, leg pain, diabetic neuropathy, and carpal tunnel.  (Tr. 434).

Dr. Kobaivanova next opined that Collins could: (1) occasionally reach; (2) push/pull less than occasionally; and (3) never handle, finger, or feel.  (*Id.*).  In support, she referred to an October 2014 physical performance evaluation.  (*Id.*).  Dr. Kobaivanova last opined that she expected Collins's impairments would cause her to be absent more than three times per month.  (*Id.*).

##### b.       April 13, 2015

On April 13, 2015, Dr. Kobaivanova wrote a letter stating that Collins had been her patient for "the past several years;" Collins had arthritis of the neck, shoulders, and arms; and (3) that condition limited her activities of daily living "as well as employment responsibilities." (Tr. 455).

17

### c.      March 17, 2016

On March 17, 2016, Dr. Kobaivanova prepared a second form "Physical Residual Functional Capacity" assessment.  (Tr. 457-58).  She gave the same limitations to Collins's ability to lift/carry and stand/walk/sit as her November 2014 evaluation, except Collins could only sit for 20 minutes and stand for 25 minutes before needing to alternate positions.  (Tr. 457). In support, Dr. Kobaivanova cited Collins's generalized osteoarthritis, diabetes with neurological complications, and anemia.  (Tr. 457-58).

Dr. Kobaivanova next opined that Collins could: (1) reach and handle occasionally; (2) feel and push/pull less than occasionally; and (3) never finger.  (Tr. 458).  In support, Dr. Kobaivanova stated that Collins had neuropathy due to diabetes and carpal tunnel.  (*Id.*).  She also reiterated that she expected Collins to be absent more than three times per month.  (*Id.*).

### d.      May 17, 2019

On May 17, 2019, Dr. Kobaivanova prepared a "Physical Residual Functional Capacity Report."  (Tr. 1502).  She indicated that Collins had diagnoses of chronic bilateral low back pain with left-sided sciatica and carpal tunnel syndrome, with a poor prognosis.  (*Id.*). Dr. Kobaivanova listed Collins's symptoms as: pain and tenderness of the lumbar area, multiple joint pain, neuropathic pain of extremities, fatigue, and increased pain caused by repetitive movements.  (*Id.*).

In response to a prompt, Dr. Kobaivanova indicated that Collins could walk less than one city block without rest or severe pain.  (*Id.*).  She also circled and checked various options, indicating that Collins could: (1) sit up to two hours at one time; (2) stand up to one hour at one time; (3) sit less than two hours in an eight-hour workday, (but she left blank the stand/walk option); (4) lift/carry 10 lbs. rarely and less than 10 lbs. occasionally; (5) climb stairs and kneel

18

occasionally; (6) twist, stoop, crouch, climb ladders, and crawl rarely; (7) never balance;

(8) reach, handle, feel, and push/pull occasionally; and (9) never hear or speak.  (Tr. 1502-03).

Dr. Kobaivanova indicated that Collins needed a job that permitted her to shift positions at will

and take unscheduled breaks.  (Tr. 1502).  She indicated that Collins would have good and bad

days, but did not check any boxes regarding how often Collins would be absent from work.

(Tr. 1503).  She also indicated that environmental restrictions were not assessed.  (Tr. 1504).

Dr. Kobaivanova did not provide explanations for this assessment.  *See* (Tr. 1502-04).

### 2.      Consultative Examiner – Dorothy Bradford, MD

On December 16, 2014, Dorothy Bradford, MD, prepared a form evaluation for state

disability benefits.  (Tr. 440-43).  Dr. Bradford opined that Collins had normal strength and

movement in her shoulder, elbow, wrist, finger, knee, foot, and toes.  (Tr. 440).  She had normal

manipulation, pinch, and fine coordination with both hands, but abnormal grasp.  (*Id.*).  Collins

had a normal ability to pick up large and small objects.  (Tr. 440-41).  No muscle spasm or

atrophy was observed.  (Tr. 441).  Dr. Bradford opined that Collins had normal range of motion

throughout.  (Tr. 441-43).

Attached to Dr. Bradford's opinion were December 16, 2014 treatment notes.  (Tr. 444-

46).  Collins reported diabetes and "trigger fingers" of the middle finger, left shoulder pain,

chronic low back pain, and carpal tunnel that made her hands "weak."  (Tr. 444).  Upon

examination, Dr. Bradford noted normal stability and full range motion in Collins's extremities,

with "4/5" handclasps.  (Tr. 446).  Dr. Bradford also noted decreased sensation in the median

nerve.  (*Id.*).  Dr. Bradford diagnosed Collins with "moderate bilateral CTS that . . . caused

decreased handclasp."  (*Id.*).

### 3.    Other Source Opinion – Marie Soha, MPT

On October 6, 2014, Collins visited Marie Soha, MPT, who conducted a functional capacity evaluation of Collins.  (Tr. 422, 543).  Collins reported 8/10 pain and estimated that she could sit for up to 20 minutes, stand for up to 25 minutes, and walk for up to 30 minutes without a break.  (Tr. 422).  Her pain was worst (9/10) when walking on a treadmill.  (Tr. 425).  Collins indicated that she needed her husband's assistance to lift skillets, carry laundry baskets, mop, and do yard work.  (Tr. 425).  She could manage self-care, but not as fast as she used to.  (*Id.*).

Upon evaluation, Soha indicated that Collins sat for 38 minutes, alternated between standing and walking for 28 minutes, stood for 5 minutes, and walked for 6 minutes.  (Tr. 422). She stopped sitting and static standing because of pain, stopped alternating between the two because of pain and the nature of the exam, and stopped walking because of the nature of the exam.  (*Id.*).  She could ambulate without assistive device and examination of her spine showed moderate limitations in range of motion and major limitation in extension of the lumbar spine. (Tr. 427).  Her hand strength was 3/5 with the right hand and 4/5 with the left hand.  (Tr. 428). Her range of motion for both her hands and legs were within functional and normal limitations. (*Id.*).  Soha also noted decreased light touch sensation of the right upper extremity, posterior arm, lateral forearm, lateral hand, right thigh, lateral leg, and lateral foot.  (*Id.*).

Soha further indicated that Collins demonstrated fair stair climbing tolerance.  (*Id.*). Collins could: (1) handle materials with occasional, frequent, and constant tolerances; (2) lift up to 10 lbs. in one repetition, 7.5 lbs. occasionally, 4.5 lbs. frequently, and 3.5 lbs. constantly; and (3) carry up to 15 lbs. in one repetition, 11 lbs. occasionally, 7 lbs. frequently, and 5 lbs. constantly.  (Tr. 422-23, 429.).  This placed Collins at the sedentary physical demand level,

indicating that she could occasionally lift 7.5 lbs. to 11 lbs. and lift the same weight 0-33% of the workday.  (Tr. 422-23.).

Soha stated that Collins's fine motor tests indicated poor fine and gross motor manipulation skills for her age and gender.  (*Id.*).  Soha observed positional tolerances of occasional bending, squatting, and reaching.  (Tr. 423.)  Soha opined that Collins could function at a sedentary physical demand level and recommended a multidisciplinary chronic pain program through physical therapy and vocational counseling.  (*Id.*).

### 4.    Other Source Opinion – Brett Balis, PT, DPT

On May 15, 2019, Brett Balis, PT, DPT, prepared a "Physical Residual Functional Capacity Assessment" of Collins.  (Tr. 1492-1500).  Balis opined that Collins demonstrated the ability to perform within the sedentary physical demand category and could work full time, but was limited to: (1) sitting 2 hours at a time; (2) occasionally lifting 10 lbs. below waist height; (3) occasionally lifting 8 pounds to shoulder height; (4) occasionally carrying 10 lbs.; (5) occasionally pulling 17 lbs.; and (6) occasionally pushing 22 lbs.  (Tr. 1492-94).  Collins also demonstrated occasional tolerance for above shoulder reach, bending, fine coordination, firm grasping, gross coordination, pinching, simple grasping, and walking.  (Tr. 1492, 1494).  She could frequently reach but should avoid jobs requiring static balance, squatting, and stair climbing.  (*Id.*).  Collins could sit for a total of 5 hours and 46 minutes and stand for a total of 6 hours and 34 minutes.  (Tr. 1494).

Balis further stated that Collins had moderate limitation in trunk flexion and rotation but major limitation in trunk extension, with 4.5/10 pain.  (Tr. 1496).  Her lower extremity range of motion was within normal limitations, but she had 3/5 strength in her left hip flexion, hip adduction, hip abduction, knee extension, and ankle dorsiflex and 4/5 strength in her knee

21

flexion.  (Tr. 1497).  Collins had normal range of motion with her upper extremities except her

left external rotation, which was limited to her left hear.  (*Id.*).  She also had 4/5 strength in her

shoulder flexion, shoulder abduction, internal rotation, external rotation, elbow flexion, and

elbow extension.  (*Id.*).

### 5.    State Agency Consultants

On June 16, 2014, state agency consultant Paul Morton, MD, evaluated Collins's physical

capacity based on a review of the medical record from December 3, 2013 through the date of his

assessment and determined that Collins had the physical residual functional capacity ("RFC") to

perform light work.  (Tr. 93-95).  Specifically, that Collins could: (1) occasionally lift/carry 20

lbs.; (2) frequently lift 20 lbs.; (3) sit/stand/walk for 6 hours in an 8-hour workday; (4) push/pull

without limitation other than those for lifting/carrying; (5) reach without limitation (6) handle

and finger with limitation; and (7) feel without limitation.  (Tr. 93-94).  He explained that Collins

could frequently handle and finger bilaterally despite wrist pain and positive Phalen's sign

because she had not had any EMG testing and was not interest in surgery or injection treatment

for her carpal tunnel.  (Tr. 94).

On December 26, 2014, James Cacchillo, DO, concurred with Dr. Morton's assessment,

but additionally found that Collins's recent X-rays demonstrated postural limitations, in that she

could: (1) frequently climb ramps/stairs and stoop; (2) never climb ladders/ropes/scaffolds;

(3) and balance, kneel, crouch, and crawl without limitation.  (Tr. 104-07).

### D.    Relevant Testimonial Evidence

### 1.    March 9, 2015 Hearing

Collins testified at the March 9, 2015 ALJ hearing.  (Tr. 40-72).  She lived in a three-

story house with her husband, daughter, and grandson.  (Tr. 40-41).  She could drive short

distances.  (Tr. 42).  The last time she worked was December 3, 2013, when she was laid off.
(Tr. 43).  Collins explained that she'd had a hearing for workers' compensation on account of her
carpal tunnel syndrome, but the human resources department found out about the hearing.  (Tr.
44).  They called her in on December 2, 2013 and told her she was being laid off for lack of
work, despite there being work.  (*Id.*).  That job consisted of soldering and making harnesses and
cables, during which she spent her entire shift sitting.  (Tr. 45-46).  She occasionally had to lift
the harnesses and cables and the most she had to lift was between 10 and 15 lbs.  (Tr. 46).
Collins had also worked on an assembly line installing cables and harnesses into computers.  (Tr.
49-50).

Collins testified that she could not perform full-time work because of her arthritis, carpal
tunnel, her back, her neck, and the swelling in her leg and feet.  (Tr. 51).  She would drop things
a lot and was very slow compared to how she used to be.  (*Id.*).  When she was laid off in 2013,
Collins stated that she had been told by her supervisor that her performance had diminished.  (Tr.
52, 71).

Collins stated that if she picked something up the wrong way, her hands would lock
down.  (Tr. 54).  She then would need to rub her hands for 10 to 15 minutes to unlock them.
(*Id.*).  The lockdowns occurred every other day, when she forgot how to pick up an object the
right way.  (Tr. 59-60).  Her hand symptoms began in 2009 and progressively worsened.  (Tr.
54).  Collins received therapy, but she stopped going because she could not afford it.  (*Id.*).  She
treated it with medication and wore braces all the time.  (Tr. 54-55).  Without them, the tingling
pain was "devastating."  (Tr. 55).  She treated her hands with Motrin but was limited in the
amount she could take because she had only one kidney.  (Tr. 56).  She did not want to get carpal
tunnel surgery because of the trauma she suffered with her kidney removal and the lack of a

23

guarantee that it would permanently solve her pain.  (Tr. 57-58).  Collins disclaimed ever being offered injections, which she would have been amenable to.  (Tr. 58).  Collins asserted that she had feeling in her hand but could not grasp small things.  (Tr. 58-59).  She could not close her hands all the way, and the object would slip out.  (Tr. 59).  Her hands would also progressively get more numb, such that she needed to stop what she was doing and get the numbness to go away before continuing.  (*Id.*).

Collins stated that she was told by Dr. Kobaivanova that her back pain was due to arthritis.  (Tr. 52).  The pain was localized to her lower left side and would radiate down her legs.  (*Id.*).  Collins treated the pain with medication, which alleviated it for a time until it wore off.  (Tr. 52-53).  She could not take more than one pill a day.  (Tr. 53).  Her back would cause sitting and standing to hurt.  (Tr. 60).  She could stand for between five and ten minutes.  (Tr. 66).  Collins testified that both feet swelled at the ankle upwards, but one would often swell more than the other.  (Tr. 53).  It felt as if she were walking on pins and needles.  (*Id.*).  She could walk for up to 15 minutes before her feet started swelling.  (Tr. 66-67).

Collins stated that she could grocery shop with her husband and cook.  (Tr. 60).  At the supermarket, she would lean or bend over the shopping cart to relieve her back pain.  (Tr. 60, 66).  She could stand and cook, but her husband peeled, chopped, and opened jars for her.  (Tr. 61, 65).  If they needed to pour a sauce, she had her husband do it because she would start dropping a lot of it.  (Tr. 61).  Collins washed the dishes with her husband, and her husband carried the laundry to and from the basement while she stayed in the basement and cleaned.  (*Id.*).  Her husband did the vacuuming and yardwork.  (Tr. 61-62).  Collins could use a computer, but not for too long due to the onset of numbness.  (Tr. 62, 66).  Buttoning shirts was difficult and took time, but she could use a zipper without a problem.  (Tr. 65).

24

Collins testified that the most she could lift was between five and ten pounds.  (Tr. 67).

She did not try to reach for things because of her arthritis in her shoulder.  (*Id.*).  She could not

pull or push, which is why her husband did the vacuuming.  (*Id.*).  She sometimes had issues

combing stairs.  (Tr. 68).  She had problems getting in and out of the bathtub and did not comb

her hair, which her daughter did for her.  (*Id.*).  Collins also had trouble sleeping that was caused

by her arm pain.  (Tr. 69).  She could only sleep three to four hours.  (*Id.*).

### 2.      March 22, 2019 Hearing

Collins also testified at the March 22, 2019 hearing.  (Tr. 877-904).  She could drive, but

not very far because her hands would get numb.  (Tr. 878).  Collins clarified that when she

soldered, she soldered little pieces on cables.  (Tr. 882).  She never lifted them off the table, so

she never lifted 15 lbs.  (Tr. 882-84).  She also clarified that she spent half the time on the

assembly line sitting and half the time on the assembly line standing.  (Tr. 886).

Collins stated that her conditions had worsened since the last hearing.  (Tr. 889).  She had

sciatic back pains down her left leg.  (Tr. 889-90).  In the past three years, she had only taken

medication for her back because she could not afford therapy.  (Tr. 890).  She indicated that

Dr. Kobaivanova asked to give her an injection for her hip.  (Tr. 893).  Collins slept with a

pillow behind her back and between her legs to get some relief.  (*Id.*).  Her shoulder pain

prevented her from lifting her arm very high.  (Tr. 901).  She could stand for about ten minutes

before needing to sit down and would need to lean on something when standing.  (*Id.*).

Collins testified that she had received an injection in her shoulder, which worked for a

while, but the pain came back.  (Tr. 890-91).  Her neuropathy had gotten "very bad."  (Tr. 891).

She felt it in both her hands, and it woke her up.  (*Id.*).  She was treating it with medication, but it

did not help.  (Tr. 892).  The pain would spread all over her body.  (*Id.*).  Collins stated that she

still wore braces for her carpal tunnel.  (Tr. 892).  She was looking into surgery, but it had not

been scheduled.  (Tr. 893).  She first had to see a doctor that they recommended to her.  (*Id.*).

And then whether she could afford it.  (*Id.*).

Collins stated that her husband and daughter helped her with household chores.  (Tr.

894).  It was very difficult for her to get in and out of the bathtub, button clothes, and do her hair.

(*Id.*).  She and her husband went shopping together, and he continued to bring the laundry basket

down to the basement.  (Tr. 895, 898).  He mopped, vacuumed, and did yardwork while she

dusted and cooked.  (Tr. 895, 899).  Her husband helped cutting or peeling vegetables.  (Tr. 895,

898.).

Collins's daily routine consisted of waking up, getting her husband breakfast, and sitting

around during the day.  (Tr. 896).  She would walk around the house, pray, and read the Bible.

(*Id.*).  She did not otherwise do anything.  (Tr. 896-97).  She seldom took her grandson to school

because of numbness in her hands.  (Tr. 896).  She did not walk because by the end of the day,

her feet and ankles were swollen, so she had to elevate them to reduce the swelling.  (Tr. 902).

She used her hands and feet to go up stairs due to pain and descended slowly.  (*Id.*).  She could

kneel and stand up but had problems doing so.  (*Id.*).  Bending was also very difficult due to

sciatic pain.  (*Id.*).  She could squat and bend at the knee, but with difficulty.  (Tr. 903).

## III.    The ALJ's Decision

On July 31, 2019, the ALJ issued a written decision denying Collins's claim.  (Tr. 793-

800).  The ALJ made the following paraphrased findings relevant to Collins's arguments in this

case:

1.  The date last insured was December 31, 2018.  (Tr. 796).

4.  Collins had the RFC to perform light work except: frequently climb ramps and
stairs; never climb ladders, ropes, or scaffolds; frequently balance; never be

exposed to hazards such as unprotected heights; frequent right overhead reaching; and frequent bilateral handling and fingering.  (Tr. 797).

ALJ found that Collins's medically determinably impairments could reasonably be expected to cause her alleged symptoms, but her statements regarding their limiting effects were not entirely consistent with the evidence.  (Tr. 798).

Although the last insured date was December 31, 2018, the ALJ took consideration of treatment records submitted after the date last insured, including Balis's May 15, 2019 examination.  (*Id.*).

6.  Through the date last insured, Collins was capable of performing her past relevant work as an assembly solderer and production assembler as actually and generally performed.  (Tr. 800).

Based on these findings, the ALJ determined that Collins was not disabled and denied her claims.  (Tr. 800).

## IV.  Law & Analysis

### A.  Standard of Review

The court reviews the Commissioner's final decision to determine whether it was supported by substantial evidence and whether proper legal standards were applied.  42 U.S.C. § 405(g); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007).  "Substantial evidence" is not a high threshold for sufficiency.  *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019).  "It means – and means only – 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Id.* (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).  Even if a preponderance of the evidence supports the claimant's position, the Commissioner's decision still cannot be overturned "'so long as substantial evidence also supports the conclusion reached by the ALJ.'"  *O'Brien v. Comm'r of Soc. Sec.*, 819 F. App'x 409, 416 (6th Cir. Aug 7, 2020) (quoting *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003)).  Under this standard, the court cannot decide the facts anew, evaluate credibility, or re-weigh the evidence.  *Jones*, 336 F.3d at 476.  And "it is not necessary that this court agree

27

with the Commissioner's finding," so long as it meets this low standard for evidentiary support.
*Rogers*, 486 F.3d at 241; *see also Biestek v. Comm'r of Soc. Sec.*, 880 F.3d 778, 783 (6th Cir.
2017) ("It is not our role to try the case de novo." (quotation omitted)).  This is so because the
Commissioner enjoys a "zone of choice" within which to decide cases without being second-
guessed by a court.  *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

Even if substantial evidence supported the ALJ's decision, the court will not uphold that
decision when the Commissioner failed to apply proper legal standards, unless the legal error
was harmless.  *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("[A] decision .
. . will not be upheld [when] the SSA fails to follow its own regulations and [when] that error
prejudices a claimant on the merits or deprives the claimant of a substantial right."); *Rabbers v.
Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 654 (6th Cir. 2009) ("Generally, . . . we review
decisions of administrative agencies for harmless error.").  Furthermore, the court will not
uphold a decision when the Commissioner's reasoning does "not build an accurate and logical
bridge between the evidence and the result."  *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D.
Ohio 2011) (quoting *Sarchet v. Charter*, 78 F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v.
Astrue*, No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (E.D. Mich. Nov. 1, 2012) ("If relevant
evidence is not mentioned, the court cannot determine if it was discounted or merely
overlooked."); *McHugh v. Astrue*, No. 1:10-CV-734, 2011 U.S. Dist. LEXIS 141342 (S.D. Ohio
Nov. 15, 2011); *Gilliams v. Astrue*, No. 2:10 CV 017, 2010 U.S. Dist. LEXIS 72346 (E.D. Tenn.
July 19, 2010); *Hook v. Astrue*, No. 1:09-CV-19822010, 2010 U.S. Dist. LEXIS 75321 (N.D.
Ohio July 9, 2010).  Requiring an accurate and logical bridge ensures that a claimant, as well as a
reviewing court, will understand the ALJ's reasoning.

The Social Security regulations outline a five-step process the ALJ must use to determine whether a claimant is entitled to benefits: (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or combination of impairments; (3) if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. Part 404, Subpart P, Appendix 1; (4) if not, whether the claimant can perform her past relevant work in light of his RFC; and (5) if not, whether, based on the claimant's age, education, and work experience, she can perform other work found in the national economy.  20 C.F.R. § 404.1520(a)(4)(i)-(v); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642-43 (6th Cir. 2006).  Although it is the Commissioner's obligation to produce evidence at Step Five, the claimant bears the ultimate burden to produce sufficient evidence to prove that she is disabled and, thus, entitled to benefits.  20 C.F.R. § 404.1512(a).

### B.  Step Four – Weighing Opinion Evidence

Collins argues that the ALJ failed to apply proper legal standards and reach a decision supported by substantial evidence in her evaluation of Dr. Kobaivanova's opinion.  ECF Doc. 13 at 16-21.  Collins argues that the ALJ failed to provide "good reasons" for discounting Dr. Kobaivanova's opinion.  ECF Doc. 13 at 19.  She argues that Dr. Kobaivanova's finding that she could neither speak nor hear was not a valid basis to reject the opinion because the limitation was a clear "error or oversight."  *Id.*  The ALJ's rationale that rarely stooping was inconsistent with an ability to sit and alternate between sitting and standing, Collins contends, was ambiguous and unreasonable because stooping – bending at the waist – does not necessarily correlate with the ability to sit or the need to change positions.  *Id.*  Collins argues that the ALJ's citation of only two of Dr. Kobaivanova's treatment notes demonstrating normal findings does not satisfy the "good reasons" standard because the record contained many more corroborative treatment

notes from Dr. Kobaivanova and other consistent evidence.  ECF Doc. 13 at 19-21.  Yet, Collins continues, the ALJ only cited to treatment notes from March and June 2014 to support her reasons to discount Dr. Kobaivanova.  ECF Doc. 13 at 20.  The ALJ's reasoning, Collins argues, mischaracterized the record evidence, and failed to acknowledge a significant portion of the record supporting Dr. Kobaivanova's opinions.  ECF Doc. 13 at 20-21.

Collins additionally argues that the ALJ's overall evaluation of the opinion evidence was flawed.  ECF Doc. 13 at 21.  She asserts that the ALJ improperly afforded little weight to Dr. Bradford's consistent opinion, mischaracterized Dr. Bradford's findings and failed to acknowledge those that would support Collins's allegations, such as diminished sensation at the median nerve distribution.  *Id.*  She further argues that the ALJ's rationale for giving Dr. Morton and Dr. Cacchillo greater weight than other sources was flawed because they lacked the benefit of over a thousand pages of later submitted evidence.  *Id.*  The Commissioner responds with a point by point rebuttal to Collins's arguments, offering typical arguments of the Commissioner. *See generally* ECF Doc. 15.

### 1.    Treating Source Standard

At Step Four, an ALJ must weigh every medical opinion that the SSA receives.  20 C.F.R. § 404.1527(c).  An ALJ must give a treating source opinion controlling weight, unless the opinion is: (1) not "supported by medically acceptable clinical and laboratory diagnostic techniques"; or (2) inconsistent with finding in the treating source's own records or other medical evidence in the case record.  20 C.F.R. § 404.1527(c)(2); *Biestek*, 880 F.3d at 786.  And, if the ALJ finds either prong justifies giving the treating source opinion less-than-controlling weight, she must articulate "good reasons" for doing so – *i.e.*, explain which prong justifies that

decision.  *See Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013); *Biestek*, 880 F.3d at 786.

If an ALJ does not give a treating physician's opinion controlling weight, she must determine the weight it is due by considering the length of the length and frequency of treatment, the supportability of the opinion, the consistency of the opinion with the record as a whole, and whether the treating physician is a specialist.  *See Gayheart*, 710 F.3d at 376; 20 C.F.R. § 404.1527(c)(2)–(6).  The ALJ must provide an explanation "sufficiently specific to make clear to any subsequent reviewers the weight the [ALJ] gave to the treating source's medical opinion and the reasons for that weight."  *Gayheart*, 710 F.3d at 376; *see also Cole v. Astrue*, 661 F.3d 931, 938 (6th Cir. 2011) ("In addition to balancing the factors to determine what weight to give a treating source opinion denied controlling weight, the agency specifically requires the ALJ to give good reasons for the weight he actually assigned.").  Nevertheless, nothing in the regulations requires the ALJ to explain how she considered each of the factors.  *See* 20 C.F.R. § 404.1527(c); *see also Francis v. Comm'r of Soc. Sec.*, 414 F. App'x 802, 804–05 (6th Cir. 2011) (noting that the regulations do not require "an exhaustive factor-by-factor analysis," so long as the ALJ has complied with the regulations' procedural safeguard by stating good reasons for the weight given to the treating source's opinion).  Further, nothing in the regulations requires the ALJ to bifurcate her controlling weight and non-controlling weight analyses. *Cf. Allen v. Comm'r of Soc. Sec.*, 561 F.3d 646, 651 (6th Cir. 2009) (holding that an ALJ's one-sentence rejection of a treating physician's opinion satisfied section 404.1527(d)(2)'s "good reasons" requirement); *Bledsoe v. Barnhart*, 165 F. App'x 408, 412 (6th Cir. 2006) ("The ALJ reasoned that Dr. Lin's conclusions are 'not well supported by the overall evidence of record and

31

are inconsistent with other medical evidence of record.'  This is a specific reason for not affording controlling weight to Dr. Lin.").

        **2.**    **Dr. Kobaivanova**

          **a.**      **April 13, 2015 Opinion**

I agree with the Commissioner's position that Dr. Kobaivanova's April 13, 2015 letter was not a medical opinion.  The letter consisted of three sentences stating Collins's length of treatment with Dr. Kobaivanova, Collins's arthritis diagnoses, and Dr. Kobaivanova's opinion that arthritis limited Collins's activities of daily living and employment responsibilities.  (Tr. 455).  "A medical opinion must reflect 'judgments about the nature and severity of the claimant's impairment(s), including [her] symptoms, diagnosis and prognosis, what [she] can still do despite impairment(s), and [her] physical or mental restrictions.'"  *Fronczak v. Berryhill*, No. 16-11554, 2017 U.S. Dist. LEXIS 140870, at *17 (E.D. Mich. Aug. 7, 2017) (alterations omitted) (quoting 20 C.F.R. §§ 404.1527(a)(1), 416.927(a)(1)).  Dr. Kobaivanova's April 13, 2015 letter failed to specify how Collins's arthritis impaired her activities of daily living or her ability to perform work-related tasks or to specify what Collins *can* do in spite of her limitations.  *Id.*; 20 C.F.R. § 404.1527(a)(1).  Thus, Dr. Kobaivanova's April 13, 2015 opinion was not due *any* weight.  *Soto v. Comm'r of Soc. Sec.*, No. 17-10054, 2018 U.S. Dist. LEXIS 50606, at *12 (E.D. Mich. Mar. 2, 2018) ("[T]he ALJ need not assign any weight to evidence that is not a medical opinion.").  Collins cannot, therefore, establish that a remand is warranted based on any alleged error the ALJ may have committed in evaluating the April 13, 2015 letter.  *Rabbers*, 582 F.3d at 654.

**b.  November 6, 2014, March 17, 2016, and May 17, 2019 Opinions**

The ALJ complied with the regulations in her evaluation of the other opinion evidence of Dr. Kobaivanova in light of the entire medical record and clearly stated the weight given to each medical opinion.  *Gayheart*, 710 F.3d at 376; *Cole*, 661 F.3d at 938; 20 C.F.R. § 404.1527(c); (Tr. 799).  The ALJ also articulated good reasons for giving Dr. Kobaivanova's opinions little weight when she explained that Dr. Kobaivanova's opinions consisted of checked marked boxes or circles – *i.e.*, lacked supporting rationale.  *Gayheart*, 710 F.3d at 376; *Cole*, 661 F.3d at 938; 20 C.F.R. § 404.1527(c); (Tr. 799).  The regulations did not require the ALJ to recite a lengthy discussion regarding her reasons, to explicitly discuss each regulatory factor, or to bifurcate her controlling weight and noncontrolling weight analyses.  And her decision was sufficient to explain the reasons she gave Dr. Kobaivanova's opinions little weight.  *Gayheart*, 710 F.3d at 376; *Cole*, 661 F.3d at 938; *Francis*, 414 F. App'x at 804–05; *Allen*, 561 F.3d at 651; *Bledsoe*, 165 F. App'x at 412.

The ALJ's finding that the opinions lacked supporting rationale and consisted merely of check-marks and circles on pre-printed forms was supported by substantial evidence. Dr. Kobaivanova's November 6, 2014 opinion of Collins's stamina for lifting, carrying, and standing, and March 17, 2016 physical RFC opinion was a completed form with circled responses for which Dr. Kobaivanova only cited Collins's diagnoses in support.  (Tr. 433-34, 457-58).  And her May 17, 2019, opinion was completed on a check marked form that provided no explanation for Collins's asserted functional limitations.  (Tr. 1502-03).  Given the lack of supporting explanation for the limitations espoused, the ALJ was entitled to discount these opinions.  *Ellars v. Comm'r of Soc. Sec.*, 647 F. App'x 563, 566-68 (6th Cir. 2016).  *See also Brown v. Saul*, No. No. 1:18-cv-1463, 2019 U.S. Dist. LEXIS 145564, at *14-15 (N.D. Ohio

33

Aug. 27, 2019); *Martin v. Berryhill*, No. 5:18-cv-924, 2019 U.S. Dist. LEXIS 150569, at *24 (N.D. Ohio Sept. 4, 2019); *Serrano v. Berryhill*, No. 1:17CV2644, 2019 U.S. Dist. LEXIS 26075, at *23-24 (N.D. Ohio Jan. 30, 2019).

Dr. Kobaivanova's November 6, 2014 opinion regarding Collins's ability to reach, handle, finger, feel, and push/pull, did not rely on Collins's diagnosed conditions for support. Instead, Dr. Kobaivanova cited as support an "attached physical performance evaluation October 2014." (Tr. 434). But there was nothing attached to the form. *See* (Tr. 433-34). Although Physical Therapist Soha issued an October 6, 2014 RFC evaluation, she did not opine that Collins could never handle, finger, or feel. (Tr. 422-31). So, it is unclear what the basis was for Dr. Kobaivanova's opinion regarding Collins's capacity reach, handle, finger, feel, push, or pull. Thus, Dr. Kobaivanova's November 6, 2014 opinion likewise was properly discounted. *See Ellars*, 647 F. App'x at 566-68; *see also Hyson v. Comm'r of Soc. Sec.*, No. 5:12CV1831, 2013 U.S. Dist. LEXIS 79803, at *38 (N.D. Ohio June 5, 2013) ("Because Dr. Martinez failed to provide an explanation of her conclusions or identify any objective medical evidence to support her opinions, the ALJ did not err in discounting her opinion.").

The ALJ's other reasons for discounting Dr. Kobaivanova's opinions, however, were more problematic. The ALJ first found that Dr. Kobaivanova's opinions were internally inconsistent because she opined on May 17, 2019 that Collins could never hear or speak, both of which the ALJ observed Collins doing at the ALJ hearing. (Tr. 799). It is unclear how an opinion is internally inconsistent when there are no other findings in any of Dr. Kobaivanova's opinions regarding Collins's ability to hear or speak with which to be inconsistent. *See* (Tr. 433-34, 457-58, 1502-04). And the ALJ could not use her personal observations of Collins at the ALJ hearing as a "good reason" for rejecting Dr. Kobaivanova's opinion. *Taynor v. Astrue*, No.

34

5:12-cv-1782, 2013 U.S. Dist. LEXIS 54921, at *21 (N.D. Ohio Apr. 17, 2013). Moreover, there

can be no doubt that a mistake was made; no one is claiming Collins was disabled because she

was blind or mute. At most, Dr. Kobaivanova was guilty of carelessness – not inconsistency – in

this portion of her opinion.

The ALJ next found that Dr. Kobaivanova's opinions was internally inconsistent because

her conclusion that Collins could rarely stoop was at odds with her finding that she could both sit

and alternate between sitting and standing. (Tr. 799). Dr. Kobaivanova did make those findings,

but they are not inconsistent. Stooping is defined as "bending the body downward and forward

by bending the spine at the waist." SSR 85-15, 1985 SSR LEXIS 20 *18. It is unclear how

Dr. Kobaivanova's finding that Collins could only rarely bend her spine at the waist downward

and forward was inconsistent with an ability to sit and to alternate between sitting and standing.

There is no evidence in the record suggesting that bending forward at the waist is a necessary

part of sitting and standing.

The ALJ last found that Dr. Kobaivanova's opinions were not consistent with the medical

record, noting that her treatment records detailed Collins's complaints of pain and reduced

functioning but also described Collins as having normal range of motion of the spine, intact

muscular strength, not joint swelling, and grossly intact muscular sensation. (Tr. 799). This may

have been the support for the ALJ's finding that Collins could rarely stoop (finding that

Dr. Kobaivanova made for the first time on May 17, 2019 (Tr. 1503)), but it is unclear what the

ALJ thought the relationship was between the ability to bend at the waist and Dr. Kobaivanova's

observations regarding joint swelling, grossly intact muscular sensation, and intact muscle

strength. The ALJ's reasoning on these points verges on the failure to build an accurate and

logical bridge between the evidence and her reasons for why she gave Dr. Kobaivanova's opinion little weight.  *Fleischer*, 774 F. Supp. 2d at 877.

Nevertheless, the ALJ provided other reasons that could independently justify discounting Dr. Kobaivanova's opinions.  By having done so, we can overlook the lack of clarity on one point because it is harmless error at worst.  *See Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 547 (6th Cir. 2004) (An error in weighing medical opinions is harmless when "the Commissioner has met the goal of [the regulations] – the provision of the procedural safeguard of reasons.").  Specifically, the Sixth Circuit has recognized that a failure to observe procedural requirements in evaluating a treating physician opinion can be harmless when the "treating source's opinion is so patently deficient that the Commissioner could not possibly credit it."  *Id.* Checklist opinions meet the patently deficient standard.  *Hernandez v. Comm'r of Soc. Sec.*, 644 F. App'x 468, 475 (6th Cir. 2016).

Although the ALJ could have more fully expanded on her reasons for discounting Dr. Kobaivanova's opinions, nevertheless, substantial evidence did support the ALJ's finding that the doctor's opinions – expressed without substantiation on checklist forms – were not to be credited.  *Biestek*, 139 S. Ct. at 1154.  Even if a preponderance of the evidence might have supported a different conclusion, the ALJ's decision to discount Dr. Kobaivanova's opinions fell squarely within the Commissioner's "zone of choice" and cannot be second-guessed by this court.  *O'Brien*, 819 F. App'x at 416; *Jones*, 336 F.3d at 476-77; *Mullen*, 800 F.2d at 545.

### 3.    Dr. Bradford

Collins challenges the ALJ's evaluation of Dr. Bradford's opinion and her December 16, 2014 treatment notes.  ECF Doc. 13 at 21 (citing (Tr. 446)).  The ALJ discussed the treatment notes in her evaluation of Dr. Bradford's consultative opinion and gave the opinion little weight.

The ALJ discounted the opinion because it did not provide a function by function analysis of Collins's exertional limitations or provide enough analysis of whether Collins's decreased handclasp strength supported any functional limitations.  (Tr. 799).  In essence, the ALJ found that it was not a medical opinion.  The ALJ reached that conclusion after applying proper legal standards, and it was supported by substantial evidence.

Dr. Bradford's notes listed Collins's statements regarding her shoulder and back pain and carpal tunnel issues; Collins's past medical history; and a review of Collins's subjective system complaints and objective medical findings.  (Tr. 444-46).  Dr. Bradford also diagnosed Collins with moderate bilateral carpal tunnel syndrome, which caused decreased handclasp.  (Tr. 446). What's missing from Dr. Bradford's treatment notes is an opinion about Collins's functional impairments – what Collins could do despite her impairments.  20 C.F.R. § 404.1527(a)(1); *see also Mohssen v. Comm'r of Soc. Sec.*, No. 12-14501, 2013 U.S. Dist. LEXIS 165782, at *25-26 (E.D. Mich. Oct. 28, 2013) (holding that physician's treatment notes did not constitute a medical opinion when they contained basic clinical findings and the claimant's subjective complaints). Thus, Dr. Bradford's December 26, 2015 treatment notes were not due *any* weight.  *Soto*, No. 17-10054, 2018 U.S. Dist. LEXIS 50606, at *12.

Moreover, the ALJ incorporated a reduction in handling and fingering consistent with Dr. Bradford's finding that Collins had decreased (4/5) handclasp, such that any error that the ALJ may have committed in evaluating Dr. Bradford's opinion was harmless.  *See Wilson*, 378 F.3d at 547 (stating that an error in evaluating the opinion evidence may be harmless when the Commissioner makes findings consistent with the opinion); (Tr. 797, 799).

Next, Collins offers only a single-sentence assertion that the ALJ mischaracterized Dr. Bradford's findings and failed to acknowledge her finding that Collins had decreased median

nerve distribution.  ECF Doc. 13 at 21.  Because Collins has not elaborated on how the ALJ

mischaracterized Dr. Bradford's findings, she cannot prevail on that argument.  *Williamson v.*

*Recovery Ltd. P'ship*, 731 F.3d 608, 621 (6th Cir. 2013) ("Issues adverted to in a perfunctory

manner, without some effort to develop an argument, are deemed forfeited.").  Nor can she

prevail on her argument that the ALJ ignored Dr. Bradford's finding that Collins had decreased

median nerve distribution because Dr. Bradford did not ascribe any functional limitations to that

objective finding.  *Rabbers*, 582 F.3d at 654.

### 4.    State Agency Consultants

In the Sixth Circuit, the ALJ may rely on the opinion of a consulting physician who did

not have the opportunity to review later-submitted medical records so long as there is "some

indication" that the ALJ at least considered the fact that the opinions were outdated before

assigning them greater weight.  *Spicer v. Comm'r of Soc. Sec.*, 651 F. App'x 491, 493-94 (6th

Cir. 2016) (quotation marks omitted).  The ALJ discussed Collins's medical records through

December 2017 and the opinion evidence through May 2019 and indicated that she based her

RFC finding on consideration of the entire record.  (Tr. 796, 798-99); *Buckhannon ex rel. J.H.*,

368 F. App'x 674, 678–79 (6th Cir. 2010) ("[W]e read the ALJ's decision as a whole and with

common sense).  Thus, there is at least some indication that the ALJ considered post-opinion

evidence before assigning partial weight to Dr. Morton's opinion and "greater weight" to Dr.

Cacchillo's opinion.  *See Spicer*, 651 F. App'x at 493-94; *see also Van Pelt v. Comm'r of Soc.*

*Sec.*, Case No. 1:19-cv-2844, 2020 U.S. Dist. LEXIS 244781, at *33 (N.D. Ohio Dec. 30, 2020);

*Jacks v. Comm'r of Soc. Sec.*, No. 3:15-cv-309, 2017 U.S. Dist. LEXIS 19229, at *13-14 (S.D.

Ohio Feb. 10, 2017).

C.      Step Four – Subjective Symptom Complaints

Collins argues that the ALJ failed to apply proper legal standards or reach a conclusion supported by substantial evidence in evaluating her subjective symptom complaints.  ECF Doc. 13 at 21-24.  She argues that her conservative treatment and refusal to undergo injections was not a sound basis for discounting her subjective symptom complaints.  ECF Doc. 13 at 22-23. Collins notes that she testified that she refused surgery because of her past experience and that she later reconsidered and was considering surgery at the time of the ALJ hearing, for which a consultation had not yet been scheduled.  ECF Doc. 13 at 23.  Collins argues that the ALJ only cited one instance when she did not check her blood sugar, even though she had been repeatedly described by Dr. Thornton as compliant with her medication and checking her blood sugar.  Id. Collins also asserts that, although the ALJ cited records showing normal gait, an ability to dress herself, and negative straight leg raise, there were other – unspecified – findings supporting her credibility.  Id.  She notes that she testified that she had difficulty buttoning and doing her hair. Id.

The Commissioner responds that the ALJ was not required to consider what Collins was planning to do in the future, given that her date last insured was December 31, 2018.  ECF Doc. 15 at 11-16.  The Commissioner argues that Collins's past kidney surgery did not explain her refusal to accept injections, the ALJ was not required to accept her subjective complaints, and despite her refusal to accept surgery for carpal tunnel syndrome she requested bunion surgery. ECF Doc. 15 at 12-13.  Therefore, the Commissioner contends that the ALJ did not err in finding that Collins's conservative treatment belied the severity of her symptoms.  ECF Doc. 15 at 13. The Commissioner continues that there were other records showing that Collins failed to check her blood sugar, she failed to take medication as directed, and she admitted that her blood sugar

39

levels were improved when compliant with medication.  *Id.*  The Commissioner argues that Collins waived any argument that the record contained records supporting her allegation that she could not maintain normal gait, dress herself, and had positive straight leg raise tests.  ECF Doc. 15 at 13-14.  And, the Commissioner states, the record repeatedly showed Collins denying difficulty getting dressed.  ECF Doc. 15 at 14.

### 1.    Subjective-Symptom Complaint Standard

At Step Four of the sequential analysis, the ALJ must determine a claimant's RFC by considering all relevant medical and other evidence.  20 C.F.R.  404.1520(e).  The RFC is an assessment of a claimant's ability to do work despite his impairments.  *Walton v. Astrue*, 773 F. Supp. 2d 742, 747 (N.D. Ohio 2011) (citing 20 C.F.R. § 404.1545(a)(1) and SSR 96-8p, 1996 SSR LEXIS 5 (July 2, 1996)). Relevant evidence includes a claimant's medical history, medical signs, laboratory findings, and statements about how the symptoms affect the claimant.  20 C.F.R. § 404.1529(a); *see also* SSR 96-8p, 1996 SSR LEXIS 5.  A claimant's subjective symptom complaints may support a disability finding only when objective medical evidence confirms the alleged severity of the symptoms.  *Blankenship v. Bowen*, 874 F.2d 1116, 1123 (6th Cir. 1989).  An ALJ is not required to accept a claimant's subjective symptom complaints and may properly discount the claimant's testimony about her symptoms when it is inconsistent with objective medical and other evidence.  *See Jones*, 336 F.3d at 475–76; SSR 16-3p, 2016 SSR LEXIS 4 *15 (Oct. 25, 2017).  If an ALJ discounts or rejects a claimant's subjective complaints, she must clearly state his reasons for doing so.  *See Felisky v. Bowen*, 35 F.3d 1027, 1036 (6th Cir. 1994).

40

2.      **Analysis**

The ALJ applied proper legal standards in evaluating Collins's subjective symptom complaints. 42 U.S.C. § 405(g); *Rogers*, 486 F.3d at 241.  The ALJ complied with the regulations by: (1) expressly considering all of Collins's severe and non-severe impairments in light of the medical evidence, other evidence, and Collins's statements regarding her symptoms; and (2) clearly explaining that she rejected Collins's subjective symptom complaints because her statements regarding the intensity, persistence, and limiting effects of her symptoms were not consistent with the objective evidence. 20 C.F.R. § 404.1520(e); SSR 96-8p, 1996 SSR LEXIS 5; (Tr. 797-98).  The ALJ provided sufficiently clear reasons for rejecting Collins's subjective symptom complaints when she stated that: (1) Collins had received conservative treatment for her carpal tunnel syndrome and did not wish to undergo surgery or receive injections that might alleviate her symptoms; and (2) despite her radiculopathy, osteoarthritis, right rotator cuff tendinosis, and partial tear, Collins maintained normal gait, could dress herself, and had a negative straight leg raise.  (Tr. 798); *Felisky*, 35 F.3d at 1036.

The ALJ's statement that Collins's neuropathy symptoms appeared exacerbated when she did not follow her prescribed treatment, taken at face value, would not undermine Collin's credibility because exacerbation of symptoms does not mean that those symptoms – and their limiting effects – did not exist.  Such reasoning might constitute a failure to adequately explaining her reasons for discounting Collins's symptoms and build an accurate and logical bridge. *Fleischer*, 774 F. Supp. 2d at 877.  But the ALJ did not stop there.  She went on to explain that muscle testing confirmed no more than minimally reduced strength and sensation and that Collins maintained the ability to ambulate effectively.  (Tr. 798).  The ALJ's overall reasoning for discounting Collins's subjective symptom complaints tracked several of the

41

relevant factors, including a discussion of Collins's daily activities, precipitating or aggravating factors, the duration and intensity of her symptoms, and the effectiveness of her treatment.  20 C.F.R. § 404.1529(c)(3); *see Temples*, 515 F. App'x at 462.  And Collins's decision to pursue a conservative course of treatment was both a valid consideration in assessing subjective symptom complaints and a "legitimate reason on which the Commissioner may rely to discount credibility."[2]  *Piercy v. Comm'r of Soc. Sec.*, 5:18 CV 2214, 2019 U.S. Dist. LEXIS 198499, at *37-38 (N.D. Ohio Nov. 15, 2019) (citations omitted).  Thus, the ALJ applied proper legal standards in evaluating Collins's subjective symptom complaints.

Substantial evidence supported the ALJ's conclusions regarding Collins's subjective symptom complaints.  42 U.S.C. § 405(g); *Rogers*, 486 F.3d at 241.  Substantial evidence supported the ALJ's determination that Collins received conservative treatment for her carpal tunnel syndrome.  Specifically: (1) Dr. Gopalakrishnan's December 10, 2013, treatment notes referring Collins to consult a plastic surgeon for her carpal tunnel syndrome and noting that she was apprehensive about surgery; (2) Dr. Umeda's December 19, 2013 treatment notes indicating that Dr. Umeda offered surgery and non-surgical options, such as physical/occupational therapy and steroid injections, but that Collins declined steroid injections and agreed to see a surgeon; (3) Dr. Tunsupon's January 14, 2014 treatment notes stating that Collins was "not ready for surgical decompression at this time;" (4) Dr. Gopalakrishnan's March 4, 2014 treatment notes indicating that he discussed steroid injections and surgery and that Collins deferred the matter because she was not "enthusiastic about either;" (5) treatment records noting Collins's failure to appear to physical therapy; (6) Dr. Azmat's March 7, 2015 treatment notes indicating that Collins did not

---

[2] *Piercy* used the term "credibility," consistent with then existing regulations.  The current regulations do not use that term.  But in both the old and the new, and ALJ is required to evaluate the consistency of the claimant's statements about her pain and symptoms with the medical evidence in the record.

want surgery for her carpal tunnel; (7) Dr. Kobaivanova's June 15, 2016 treatment notes indicating that Mobic alleviated Collins's carpal tunnel pain; (8) Dr. Sing's November 28, 2017 treatment notes referring Collins to an orthopedist after discussing steroid injections and surgical management; and (9) Dr. Kobaivanova's May 3, 2019 treatment notes indicating that Collins was "not willing to have surgical intervention." (Tr. 252, 329, 331, 351, 360, 573, 580, 728, 1456, 1542, 1544). At odds with this evidence was Collins's testimony that she did not want surgery because of the trauma she suffered during her 1985 kidney removal and the lack of guarantee that that her carpal tunnel syndrome would be permanently resolved by surgery; she had never been offered steroid injections; and she was looking into surgery. (Tr. 57-58, 893). Those were conflicts in the evidence and questions of credibility that are beyond the scope of our review. *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007). Our role is to determine whether there was enough evidence that a reasonable mind might accept as sufficient to support the ALJ's conclusions, and there was. *Id.*

Substantial evidence also supported the ALJ's decision to discount Collins's subjective symptom complaint about her peripheral neuropathy symptoms – because muscle testing confirmed minimally reduced strength and sensation and because she retained the ability to ambulate effectively. (Tr. 798). Such evidence includes: (1) Dr. Thornton's treatment notes through March 8, 2019 showing 5/5 muscle strength with plantar flexion, inversion, and eversion, 4/5 strength in dorsiflexion, intact protective sensation, intact proprioception, diminished vibratory sensation, and that Collins was ambulating without assistance; (2) physical examination results through April 23, 2019 noting normal gait, normal and symmetric reflexes, and grossly intact sensation (3) Dr. Morton's and Cacchillo's opinions that Collins could stand/walk for up to hours in an eight hour workday; (4) Soha's physical RFC evaluation

showing grossly normal lower extremity motion and 4/5 ankle dorsiflexion and decreased light touch sensation of the lateral foot; (5) Dr. Bradford's opinion that Collins had normal range of motion and strength in her foot dorsiflexors, plantar flexors, invertors, evertors, and great toe extensors; and (6) Balis's physical RFC assessment noting that Collins could stand a total of 6 hours and 34 minutes in an 8-hour workday. (Tr. 93, 104, 266, 278, 294, 299, 309, 323, 330, 336, 360, 364, 393, 402, 440, 443, 446, 492, 529, 536, 595, 604, 680, 696, 703, 730, 745, 762, 1334, 1343, 1353, 1365, 1409, 1436 1486, 1494, 1500, 1509, 1520, 1537, 1544).

And substantial evidence supports the ALJ's finding that, despite Collins's lumbar radiculopathy, osteoarthritis, rotator cuff tendinosis and partial tear, she maintained normal gait, was able to dress herself, and had negative straight leg raise. Specifically: (1) physical examinations results through April 23, 2019 noting normal gait, negative straight leg raise, and that Collins appeared well dressed; (2) Dr. Bradford's opinion that Collins had no issues buttoning and unbuttoning; and (3) Collins statements to providers through July 27, 2015 that she had no issues getting dressed or performing/completing routine activities of daily living. (Tr. 266, 281, 287, 290, 293-94, 296, 309, 312, 320, 323, 330, 333, 338, 350, 352-53, 355, 369-60, 363, 367, 369-70, 393, 396-98, 401-02, 405, 409, 419, 440-41, 445-46, 465, 483-84, 492, 497, 502-03, 510, 513, 517, 521, 527, 532, 536, 541, 546-47, 551, 554, 560-61, 566, 571-72, 582, 587-88, 594-95, 600, 604, 606-07, 610, 613, 622, 634, 639, 643, 647, 679, 696, 719-20, 730, 745, 762, 777, 1333-34, 1343, 1353, 1365, 1380, 1394-95, 1403, 1408-09, 1424, 1455, 1509, 1520, 1544, 1547). Even if other evidence in the record or even a preponderance of the evidence in the record could have supported a different conclusion, because substantial evidence supported the ALJ's subjective symptom evaluation, this court cannot overturn it. *O'Brien*, 819 F. App'x at 416; *Jones*, 336 F.3d at 476; *Rogers*, 486 F.3d at 241; *Biestek*, 880 F.3d at 783.

Because the ALJ applied proper legal standards and his conclusions were reasonably drawn from the record, the ALJ's evaluation of Collins's subjective symptom complaints fell within the Commissioner's "zone of choice" and may not be disturbed by this court. *Mullen*, 800 F.2d at 545.

## V. Recommendation

Because the ALJ applied proper legal standards and reached a decision supported by substantial evidence, I recommend that the Commissioner's final decision denying Collins's application for DIB be affirmed.

Dated: June 21, 2021

Thomas M. Parker
United States Magistrate Judge

_____

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document. Failure to file objections within the specified time may waive the right to appeal the District Court's order. *See U.S. v. Walters*, 638 F.2d 947 (6th Cir. 1981). *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).